**WO**                              NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Patricia J. Palmer,

                      Plaintiff,

v.

Carolyn W. Colvin,

                      Defendant.

No. CV-15-08017-PCT-JJT

**ORDER**

      At issue is the denial of Plaintiff Patricia J. Palmer's Application for Disability Insurance Benefits (DIB) by the Social Security Administration under the Social Security Act. Plaintiff filed a Complaint on February 13, 2015, asking this Court to review the denial of her benefits. (Doc. 1.) The Court has reviewed the briefs (Docs. 11, 13) as well as the Administrative Record (Doc. 10) and now affirms the Administrative Law Judge's decision (R. at 14–30) as upheld by the Appeals Council (R. at 1–6).

## I.      BACKGROUND

      Plaintiff filed an application for DIB on October 5, 2011, alleging disability beginning March 7, 2011. (R. at 17.) After Plaintiff's application was denied initially and on reconsideration, Plaintiff requested a hearing, which an Administrative Law Judge (ALJ) held on September 5, 2013. (R. at 17.) On September 17, 2013, the ALJ issued a decision denying Plaintiff's application. (R. at 14–30.) After the ALJ denied Plaintiff's request, the Appeals Council (AC) denied Plaintiff's request for review of the ALJ's

decision on December 15, 2014, making the ALJ decision the final decision of the Commissioner of Social Security. (R. at 1–6.) The present appeal followed.

### A.    Medical Evidence

#### 1.    Treating Physicians

##### a.    Dr. Kazmi

Plaintiff began seeing Dr. M.A. Kazmi in June 2011 (R. at 328) and continued to regularly see him through September 2012 (R. at 318–40, 366–87, 450). Plaintiff also later sought treatment from Dr. Kazmi in September 2013. (R. at 482–86.) Plaintiff initially reported that she was experiencing constant, all-over muscle pain that increased with activity and that she was having trouble sleeping. (*See, e.g.*, R. at 328, 457.) She also reported numbness in her feet. (R. at 319, 321, 457.) In later appointments with Dr. Kazmi, Plaintiff began complaining of leg pain, blurred vision, dizziness, and constant fatigue. (R. at 371, 373, 457.)

In 2011, Dr. Kazmi conducted various clinical tests. Electromyography (EMG) and nerve conduction velocity (NCV) testing showed pathology near to or at Plaintiff's neck. (R. at 379.) Upon examination of Plaintiff's cervical MRI, Dr. Kazmi determined Plaintiff had mild multilevel degenerative disc disease, no stenosis (compression of spinal nerve), and no other abnormalities. (R. at 325, 379.) Dr. Kazmi also performed neurologic exams, and Plaintiff's results were normal as to her nerves, motor strength, coordination, and gait and station. (*See, e.g.*, R. at 325, 457.) Dr. Kazmi ordered an MRI of Plaintiff's brain, and the results were normal. (R. at 333.) Over the course of Dr. Kazmi's treatment of Plaintiff, he made the following assessments: specified idiopathic peripheral neuropathy; acquired spondylolisthesis (displacement of vertebra) L5 on S1 (determined after review of x-rays); restless leg syndrome; periodic limb movement disorder; insomnia; fibromyalgia/myofascial spasm; anemia; lumbago (lower back pain); GERD; and other disorders of the ankle and foot joint. (R. at 277, 323, 328–29, 373, 452–53, 458.)

Dr. Kazmi completed a functional capacity report dated August 23, 2011, in which he found Plaintiff suffered from fibromyalgia, spondylolisthesis (lumbar), and chronic pain. (R. at 278, 282.) He indicated Plaintiff could do activities such as sitting, standing, and walking for only one to three hours in an eight-hour workday for a period of 12 months. (R. at 279–80.)

At appointments in May and July of 2012, Plaintiff reported increased pain in her feet, specifically her toes. (R. at 452, 454–56.) She also stated that her worst pain was in her lower back and arms and that she had pain and stiffness in her legs and hands. (R. at 452.)

Dr. Kazmi conducted several more tests in May 2012. After conducting a bilateral lower extremity nerve conduction study, he found the results were abnormal (R. at 462–66), and recommended an EMG and MRI of the lumbar spine (R. at 462). Plaintiff's July 2012 lumbar spine MRI showed the following: grade 1 anterior spondylolisthesis of L5 over S1 with associated bilateral pars (small segment of bone joining the facet joints in the back of the spine) defects; moderate bilateral neural foraminal stenosis at L5-S1 secondary to disc bulge and anterior spondylolisthesis; and asymmetrical left paramedian disc protrusion at L3-4 that abuts the thecal sac and causes mild central stenosis and mass effect on the left L4 nerve root. (R. at 467–68.)

Over a year later, Plaintiff saw Dr. Kazmi on September 11, 2013, and complained of constant pain, especially in her neck, back, and shoulders. (R. at 482.) She continued to experience numbness and pain in her legs and feet. (R. at 482.) She stated her pain increased with prolonged activity and sitting. (R. at 482.) Dr. Kazmi noted that Plaintiff had more than 20 trigger points suggesting fibromyalgia. (R. at 482.) Dr. Kazmi referred Plaintiff to a neurologist and rheumatologist for more a specific diagnosis and for her fibromyalgia, respectively. (R. at 483.)

Over the course of Plaintiff's treatment, Dr. Kazmi prescribed her numerous medications including Cymbalta (for depression/anxiety), Effexor (for depression/anxiety), Nexium (for acid reflux), Synthroid (for hypothyroidism),

temazepam (for insomnia), trazodone (for depression/anxiety), Ultram (for pain), and Vicodin, and referred her for physical therapy. (*See, e.g.*, R. at 319–20, 367, 370, 384.) While Plaintiff sometimes reported the medications relieved her pain (R. at 369, 457), she continually reported that generally, medications did not alleviate her pain or help her sleep. (R. at 319, 321, 323, 325, 328.)

### b.   FPS Medical Center, Ltd.

Plaintiff sought treatment from FPS Medical Center, Ltd. from January to September of 2011. (R. at 255–77, 284–317.) Plaintiff reported experiencing constant pain in her chest and arms. (*See, e.g.*, R. at 258, 305, 313.) An MRI of Plaintiff's cervical spine showed mild multilevel degenerative disc disease. (R. at 275.) Plaintiff continually reported that her pain was gradually worsening, and she also began to experience pain in her legs. (*See, e.g.*, R. at 262.) In May 2011, Plaintiff was diagnosed with myalgia and myositis, and was referred to a neurologist and rheumatologist. (R. at 264.) Plaintiff was also diagnosed with benign hypertension (R. at 264) and hypothyroidism (R. at 299). In July 2011, Plaintiff also began reporting constant groin discomfort. (R. at 269.)

### c.   Mohave Arthritis

Plaintiff obtained treatment from Dr. Burhan Chinikhanwala at Mohave Arthritis from June to October 2011. (*See* R. at 341–65.) Plaintiff initially reported that she had been experiencing achiness and pain in her arms, hands, and neck during the previous eight to nine months, and also experienced associated numbness and headaches. (R. at 345.) Although Dr. Chinikhanwala reported Plaintiff did not have any significant arthritic or neurological symptoms (R. at 341, 343, 354), he determined Plaintiff suffered from neuropathy, arthralgia (joint pain), myalgia, degenerative arthritis of her hands, back, and neck, and carpal tunnel (R. at 341, 346, 354).

### d.   True Rehab

Per Dr. Kazmi's physical therapy referral with a start date of December 20, 2011 and end date of July 3, 2012 (R. at 440), Plaintiff received treatment at True Rehab, but only for one month – from May to June 2012 – for her lower back pain (*see* R. at 439–

- 4 -

48). On June 28, 2012, Plaintiff indicated her pain had increased, and she did not feel physical therapy had helped her pain and numbness. (R. at 447.) She stated she "just need[s] to have a MRI." (R. at 447.) Plaintiff was then discharged. (R. at 447.)

### e.    Dr. Livingstone

Dr. Franklin Livingstone conducted an electrodiagnostic evaluation, including EMG and NCV testing, on June 7, 2013. (R. at 477–81.) He found no evidence of lumbar radiculopathy, myopathy, or motor neuron disease, but did find evidence of a mild degree of sensory peripheral neuropathy of bilateral lower extremities. (R. at 477.) Dr. Livingstone also found moderate to severe myofascial pain in the L4 to S2 paraspinal muscles, which he attributed to a muscular disorder. (R. at 477.)

### f.    Dr. Alvarado

Dr. Andres Alvarado saw Plaintiff on September 9, 2013. (R. at 486.) Plaintiff reported that her bladder control and back pain were worsening. (R. at 486.) Dr. Alvarado referred Plaintiff to another doctor for consideration of surgical options. (R. at 486.)

### g.    Rheumatology and Arthritis Consultants

Plaintiff was seen at Rheumatology and Arthritis Consultants on October 8, 2013 and November 6, 2013. (R. at 487–97.) At the October appointment, Dr. Rajitha Premaratne found Plaintiff suffered from polymyalgia – an inflammatory disorder causing muscle pain and stiffness – and that Plaintiff had 18/18 positive tender points. (R. at 491.) Dr. Premaratne noted this was consistent with Plaintiff's underlying fibromyalgia diagnosis. (R. at 491.) The doctor also noted Plaintiff had myofascial pain syndrome with 18/18 tender points, indicating Plaintiff had fibromyalgia. (R. at 491.) Plaintiff sought treatment again in November for joint pain and swelling. (R. at 487–88.)

### h.    Mental Health Treatment

Plaintiff obtained mental health treatment at Mohave Mental Health Clinic from November 2011 to February 2012. (R. at 388–438.) Plaintiff was diagnosed with adjustment disorder with anxiety and was referred for more services. (R. at 405.)

### 2.      State Agency Reports

In the ALJ's written decision dated September 17, 2013, he states he considered all of the State agency physicians' reports and cites exhibits 2A, 4A, and 13F. (R. at 24.) Exhibit 2A is the May 2012 disability determination explanation at the initial level, in which a doctor determined that based on his review of the medical record, Plaintiff could perform light work and was not disabled. (*See* R. at 55–66.) Exhibit 4A is the September 2012 disability determination explanation at the reconsideration level, in which another doctor again determined Plaintiff was not disabled. (*See* R. at 68–82.) Exhibit 13F is a one-page Disability Determination Services case analysis dated March 22, 2013, that states that Plaintiff's record was reviewed, and she was found to have the residual functional capacity for light work and could perform her previous work. (R. at 476.)

### B.      Hearing Testimony

### 1.      Plaintiff's Testimony

On September 5, 2013, Plaintiff testified before the ALJ to the following (R. at 31–49):

Plaintiff is 51 years old and has a GED. (R. at 37.) Plaintiff last worked in 2011 as a waitress and bartender for approximately two months. (R. at 34–35.) After making mistakes on a patron's order because she was in pain and could not concentrate, Plaintiff's supervisor sent her home. (R. at 35.) Plaintiff did not attempt to obtain work thereafter because her doctor had instructed her not to work. (R. at 35.) Plaintiff previously worked as a machine operator for seven years. (R. at 37.)

Plaintiff states that, at the present time, she cannot work due to the following: all over body pain; numbness and coldness in her feet; throbbing in her legs; burning and aching in her lower back; neck, arm, and shoulder pain if her arms are up too long; trouble squatting; and headaches. (R. at 35–36.) Plaintiff's back has bothered her for a "long time," becoming increasingly worse, and her other pains started about two and a half years ago. (R. at 42.) Plaintiff has problems moving her head in extreme positions.

(R. at 49.) She also has difficulty sleeping at night. (R. at 42.) Plaintiff takes several medications for her pain and medical issues. (R. at 40–41.)

Dr. Kazmi and Dr. Alvarado have told Plaintiff she may need operations on her cervical or lumbar spine due to loss of bladder control and weakened legs resulting from pinching of her spinal cord. (R. at 43–45.) Dr. Alvarado has also considered epidural injections for Plaintiff, but decided against them pending a clearer understanding of Plaintiff's medical issues. (R. at 46.) Plaintiff was referred to a nerve conduction specialist, and has an appointment with Dr. Alvarado thereafter to determine next steps for her treatment. (R. at 44, 46–47.)

Plaintiff describes that, on a typical day, she wakes up at ten or eleven o'clock in the morning, makes breakfast, watches some television, makes lunch, and then may nap because she is tired. (R. at 38.) After her nap, she will watch more television with her fiancé and help her fiancé prepare dinner. (R. at 38.) Plaintiff tries to help with the laundry, but her fiancé does most of the household chores. (R. at 40.)

Plaintiff has no source of income. (R. at 36.) Plaintiff has lived with her fiancé and his mother for seven years. (R. at 36–37.) Although Plaintiff's fiancé does not work, he receives disability and supports Plaintiff with that income. (R. at 37.)

### 2.    Vocational Expert Testimony

Sandra Beerready, a vocational expert (VE), also testified before the ALJ at the September 5, 2013 hearing. (R. at 50–53.) When the ALJ asked the VE whether a hypothetical individual – one with a high school education, who could lift and carry no more than 20 pounds occasionally or ten pounds frequently, who could only be on her feet for up to three hours and sitting for six hours in an eight-hour workday with time up on her feet limited to 30 minutes at a time, who could only occasionally bend, stoop, crouch, and crawl, who could not move her head in extreme positions, who would be limited to routine or repetitive tasks, who would be off task up to ten percent of the time, and who might miss work once a month – could perform any of Plaintiff's past work, the VE said "no." (R. at 50.) The ALJ then asked the VE to identify light, unskilled jobs the

1  hypothetical individual could perform, to which the VE responded the individual could

2  work as a cashier and a small products assembler. (R. at 51.) When the ALJ asked the VE

3  whether those jobs would still exist if the individual was off task 20 percent of the time or

4  would miss work three or more times a month, the VE answered "no." (R. at 51.)

5      Plaintiff's counsel also questioned the VE and asked whether, in the same

6  hypothetical above, but with the addition of chronic pain that prohibited concentration on

7  even simple repetitive tasks, there would be any gainful employment for the individual,

8  and the VE said "no." (R. at 52.)

9      **C.    The ALJ's Opinion**

10     ALJ Mason D. Harrell, Jr. issued an opinion dated September 17, 2013, in which

11  he concluded Plaintiff was not disabled under sections 216(i) and 223(d) of the Social

12  Security Act. (R. at 26.) The ALJ began his analysis by stating his finding that Plaintiff

13  met the insured status requirement and had not engaged in substantial gainful activity

14  during the period from her alleged onset date of March 17, 2011 through her date last

15  insured of December 31, 2013. (R. at 19.) The ALJ then listed degenerative disc disease

16  of the spine, arthritis, and anxiety as severe impairments afflicting Plaintiff. (R. at 19.)

17  The ALJ found that Plaintiff's medically determinable impairment of hypothyroidism

18  was non-severe. (R. at 19.)

19     Proceeding with the five-step inquiry, the ALJ found that the impairments or

20  combination of impairments did not meet the severity of symptoms to meet or equal any

21  of the medical listings. (R. at 19–20.)

22     The ALJ then stated his finding that Plaintiff had the residual functional capacity

23  (RFC) to perform light work as defined in 20 CFR 404.1567(b) except she could lift

24  and/or carry 20 pounds occasionally and ten pounds frequently; she could be on her feet

25  up to three hours in an eight-hour workday for 30 minutes at a time and she can sit for six

26  hours in an eight-hour workday; she can occasionally bend, stoop, crouch, or crawl; she

27  cannot move her head to extreme positions; she is limited to routine and repetitive tasks;

28  she would be off task ten percent of the time; she would miss work once a month; and she

cannot climb stairs or ladders. (R. at 21–22.) The ALJ found that Plaintiff had stated she was able to do daily activities that were not limited to the extent one would expect given her complaints of disabling symptoms and limitations. (R. at 22.) The ALJ found that Plaintiff's activities diminished the credibility of her allegations regarding her functional limitations. (R. at 22.) The ALJ also found the objective medical evidence did not support the alleged severity of symptoms. (R. at 24.) As to the medical opinions, the ALJ gave "little weight" to treating physician, Dr. Kazmi and "significant weight" to the opinions of the State agency medical/psychological consultants. (R. at 23.)

After determining Plaintiff's RFC, the ALJ found that Plaintiff could not perform any past relevant work (R. at 24–25), but there were jobs in significant numbers in the national economy that Plaintiff could perform (R. at 25). The ALJ thus found Plaintiff was "not disabled." (R. at 26.)

## II.   LEGAL STANDARDS

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step

1   five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ

2   determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R.

3   § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step

4   two, the ALJ determines whether the claimant has a "severe" medically determinable

5   physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not

6   disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's

7   impairment or combination of impairments meets or medically equals an impairment

8   listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404 (Listing of Impairments).

9   20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled.

10  *Id.* If not, the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's

11  residual functional capacity and determines whether the claimant is still capable of

12  performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not

13  disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step,

14  where he determines whether the claimant can perform any other work based on the

15  claimant's residual functional capacity, age, education, and work experience. 20 C.F.R.

16  § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled.

17  *Id.*

18  **III.    ANALYSIS**

19      Plaintiff argues that the ALJ committed legal error by failing to consider her

20  fibromyalgia. (Doc. 11, Pl's Br. at 3.) Plaintiff does not state at what step of the five-step

21  determination her contention arises from. The Court understands Plaintiff to dispute the

22  ALJ's findings at step two of the five-step process because the ALJ did not list

23  fibromyalgia as a severe medically determinable physical impairment, but did consider

24  fibromyalgia in the remainder of his opinion. (*See* R. at 19–24.)

25      The Court considers the harmless error doctrine when reviewing an ALJ's

26  decision. The doctrine provides that the Court need not remand or reverse an ALJ's

27  decision if it is clear from the record that the error is "inconsequential to the ultimate

28  nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

When, at step two, an ALJ errs by failing to find an alleged impairment "severe," such error is harmless so long as the ALJ considered the limitations of the impairment in the remainder of the analysis. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("The decision reflects that the ALJ considered any limitations posed by bursitis at Step 4. As such, any error that the ALJ made in failing to include bursitis at Step 2 was harmless.")

Here, the ALJ found in favor of Plaintiff at step two and proceeded through the entire sequential analysis, carefully considering Plaintiff's testimony and the medical evidence in assessing her RFC. (*See* R. at 19–24.) The ALJ considered the opinion of Plaintiff's treating physician, Dr. Kazmi, and noted his diagnosis that Plaintiff had fibromyalgia. (R. at 23.) The ALJ also found Plaintiff's allegations were less then fully credible (R. at 21), and then properly weighed the remaining evidence, including the specific medical reports, in detail (*see* R. 21–24). Plaintiff argues that the ALJ did not consider certain clinical test reports and medical records, including those from Dr. Premaratne, which provide evidence of Plaintiff's fibromyalgia. (Pl's Br. at 3.) The Court notes that Dr. Premaratne's report is dated October 8, 2013, and thus was not available when the ALJ issued his decision on September 17, 2013, but that the AC did consider the report. (*See* R. at 4.) Moreover, Dr. Premaratne's report states Plaintiff has "18/18 tender points positive," and otherwise merely reiterates Dr. Kazmi's previous fibromyalgia diagnosis, which the ALJ considered. (R. at 491.)

Plaintiff does not dispute that the ALJ adequately accounted for all credible limitations resulting from her alleged fibromyalgia. Plaintiff has also not set forth, and there is no evidence in the record of, any limitations that the ALJ failed to consider. Plaintiff has thus failed to show that finding her alleged fibromyalgia severe at step two would have had any effect on the ultimate disability determination. Accordingly, even if the ALJ erred by failing to find Plaintiff's alleged fibromyalgia severe at step two, the error is harmless and provides no basis for remand or reversal. *See Tommasetti*, 533 F.3d at 1038.

1  **IT IS THEREFORE ORDERED** affirming the September 17, 2013 decision of
2  the Administrative Law Judge, (R. at 14–30), as upheld by the Appeals Council on
3  December 15, 2014, (R. at 1–6).

4  **IT IS FURTHER ORDERED** directing the Clerk of Court to enter final
5  judgment consistent with this Order and close this case.

6  Dated this 25th day of February, 2016.

_____
Honorable John J. Tuchi
United States District Judge